Ex parte Drainage Commissioners of Leflore County.

[57 South. 223.]

Drainage.  *National watercourses.   Contribution.*

> Where the statute under which two drainage districts were organized "Confer no power upon the commissioners to deal with natural watercourses, but are designed solely for the purpose of creating artificial channels for the drainage of wet, swamp and overflow lands," the drainage commissioners of one district have no power to contribute to the expense incurred by another district in cleaning, straightening and deepening a natural watercourse which constitutes the outlet for the waters of the two drainage districts.

Appeal from the chancery court of Leflore county.

Hon. M. E. Denton, Chancellor.

From a judgment rendered in proceedings by the drainage commissioners of Leflore county, an appeal is taken.

The facts are sufficiently stated in the opinion of the court.

*E. D. Stone,* for appellants.

This is an appeal by the drainage commissioners of Leflore county, Mississippi, and Ellsberry district, and Lake Henry district from an order of the chancery court

of Leflore county, Mississippi, requiring compensation to be made by the Ellsberry and Lake Henry drainage districts to Rucker drainage district for work done in Rucker drainage district. Section 1720 of Mississippi Code of 1906 is as follows:

"Compensation for draining other district. After the organization of any drainage district under this chapter, or after the filing of the petition to organize any such drainage district, if any other or different drainage district lying above said proposed drainage district shall be organized and drain their lands into and empty the waters from their ditches into the ditches of the said lower drainage district, from the lands lying above and draining into such district so organized or petitioned for, the commissioners of such lower district shall ask, demand and receive of said upper district just compensation for an outlet for the waters of their said upper district, and in case said commissioners cannot agree upon the amount to be paid by such dominant or upper district to said lower district, then the same shall be submitted by petition to the chancery court in which said proposed districts were organized, and which court shall hear and determine the same as other suits."

The facts pertinent to the question at issue are as follows: Ellsberry drainage district was organized in the fall of 1907; Lake Henry district was organized in the fall of 1909; Rucker drainage district was organized in the fall of 1910. Turkey bayou is a tributary of Quiver river and is the common natural outlet for all of the waters of Lake Henry drainage district and Ellsberry drainage district, a part of Rucker drainage district, and about as much more land in the surrounding country not embraced in a drainage district. Rucker drainage district embraced the mouth or lower part of Turkey bayou, and about five miles of the stream. The main outlet of Ellsberry district enters Turkey bayou at or near the eastern boundary of Rucker drainage district.

Just east of this stream and widening out for three or four miles is a lake, averaging about three hundred feet in width; this is called "Lake Henry." East of this there are a number of tributaries and streams and these drain the county embraced in Lake Henry drainage district. Thus we have Rucker drainage district to the west and furtherest down stream. East and northeast of this we have Ellsberry drainage district. Then a large scope of country intervenes and further east and at the head waters of Lake Henry on the eastern side of the water shed is what is called the Lake Henry drainage district.

From the plain and unmistakable language of section 1720 it is plain that compensation is only allowed from one district to another in the case where the district lying above the first district organized, or proposed to be organized, shall drain the lands and empty the waters from its ditches into the ditches of the said lower district. In other words, it is only where the lower district shall have been organized first and the new district is organized further up the stream and gets the benefit of the work already done in the lower district, that compensation is required, or authorized.

Section 1720 quoted above is the only law authorizing compensation, and although we may believe the law is incomplete we cannot read into it a meaning entirely different to its plain and unmistakable langauge. Without this section 1720, compensation could not be demanded or allowed, so it being necessary that there be a law before compensation can be demanded or allowed, when we get a law we are limited to the terms and conditions of that law. In other words the drainage district chapter of the Code confers certain rights and duties upon the drainage commissioners and they are hedged about in the performance of the duties by the terms and conditions of that law. They have certain powers, some of them broad enough, levy taxes, and assessments, create liens on lands, condemning rights of way for ditches,

under the eminent domain chapter, and issue bonds, but they cannot do acts contrary to, or even inconsistent with, the provissions of that chapter. Without section 1720 in that chapter they could not ask and demand compensation in any case, and so they are limited by the terms of this statute when they attempt to act. It is plain from the facts in the case that the districts have been organized in the wrong direction for compensation to be allowed.

*Pollard & Hamner,* for appellees.

It is contended by counsel representing the drainage commissioners that section 1720 of the Code of 1906 should be literally construed, and we are frank to say that, if the court takes this view of it, no relief can now be afforded the Rucker drainage district and the ruling of the chancellor is wrong. The drainage chapter of the Code of 1906 was intended to constitute a complete scheme for the drainage of the low lands of the state, and so anxious was the legislature that said law should afford all necessary power to the commissioners for attaining its object, that it is provided by section 1711 of said act that "this act shall be liberally construed to promote the ditching, draining, and reclamation of wet, swampy and overflowed lands," etc.

The section which provides for compensation (1720) provides "that after the organization of any drainage district under this chapter, or after the filing of the petition to organize any such drainage district, if any other or different drainage district lying above said proposed drainage district shall be organized and drain their lands into and empty the waters from their ditches into the ditches of said lower drainage district, from the lands lying above and draining into such drainage district so organized or petitioned for, the commissioners of such lower district shall ask, demand and receive of said upper district just compensation for an outlet for the

waters of their upper district,'' etc.  Literally construed it would seem that the only case in which the lower districts could demand compensation of the upper districts would be when the upper district was organized subsequent to the organization or the filing of the petition to organize a lower district.  We submit that there is no reason why this section should be literally construed.

We submit that it was the legislative intent by section 1720 of the Code of 1906 to enact a plan by which two or more drainage districts might, if the commissioners saw it would be an advantage, use one and the same main channel or outlet for their waters.  We submit that the section means what the chancellor held it to mean.  It was intended to provide for and cover any case where another or different drainage district lying above the proposed district shall drain its lands into a ditch on the lower district.  In other words under the general scheme to provide proper laws for the guidance of commissioners in draining swamp lands, and under the direct provision of the legislators for a liberal construction of the drainage act (section 1711), to promote the ditches, drains and reclamation of wet, swampy and overflowed lands, the words ''shall be organized'' in line four of section 1720 are really surplusage and were never intended to be placed in the law, and under a reasonable construction of the section and the drainage laws, will be omitted in giving effect to the legislative intent.  The section so read would express what the legislature intended to say and would read as follows:

Section 1720.  Compensation for draining other district.  After the organization of any drainage district under this chapter, or after the filing of the petition to organize any such drainage district, if any or other or different drainage district lying above said proposed drainage district shall drain their lands into and empty the waters from their ditches into the ditches of the said lower drainage district from the lands lying above and

draining into such drainage district so organized or petitioned for, the commissioners for such lower district shall ask, demand, and receive of said upper district just compensation for an outlet for the waters of their said upper district," etc. 36 Cyc., Statutes 112 (O), surplusage and citations.

We believe that the chancellor reached the right result and that the proper interpretation of the drainage law would carry out and enforce the chancellor's decision.

Smith, J., delivered the opinion of the court.

The question submitted to us for decision is: Has the board of drainage commissioners of Leflore county power to contribute to the expense being incurred by the Rucker drainage district in cleaning out, straightening, and deepening Turkey bayou, a natural watercourse, which constitutes the outlet for the waters of the two drainage districts? Since the statutes under which these drainage districts were organized "confer no power upon the commissioners to deal with natural watercourses, but are designed solely for the purpose of creating artificial channels for the drainage of wet, swamp, and overflow lands" (*Haley* v. *Drainage Commissioners*, 55 South. 353), it follows, necessarily, that the question must be answered in the negative.

The judgment of the lower court is therefore reversed, and the petition dismissed.                *Reversed.*